IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
December 21, 2010 Session

**CHARLES RAY HARVEY v. STATE OF TENNESSEE**

**Appeal from the Scott County Circuit Court**
**No. 9214    E. Shayne Sexton, Judge**

_____

**No. E2010-00148-CCA-R3-PC - Filed April 29, 2011**

_____

The Petitioner, Charles Ray Harvey, appeals from the Scott County Circuit Court's denial of his petition for post-conviction relief from his conviction of first degree murder, for which he is serving a life sentence. He contends that his trial attorneys failed to provide effective assistance because they did not advise him that accepting a guilty plea offer was in his best interest and did not accurately advise him of the unlikelihood that he would prevail at trial. Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

Bruce E. Poston, Knoxville, Tennessee, for the appellant, Charles Ray Harvey.

Robert E. Cooper, Jr., Attorney General and Reporter; Matthew Bryant Haskell, Assistant Attorney General; William Paul Phillips, District Attorney General; and John W. Galloway, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The facts of the Petitioner's case were summarized by this court on direct appeal:

> This case involves the murder of the defendant's son-in-law. The body of the victim, Armando Laredo, was found in the New River.
>
> Agent Steve Vinsant of the Tennessee Bureau of Investigation testified that he assisted the Scott County Sheriff's

Department in the investigation of the victim's death. He said he viewed the victim's body on July 18, 2003, after it was recovered from a river. He said he took Vanessa Laredo, who was the victim's wife and the defendant's daughter, the defendant, and Donna LaBoy into custody and interviewed them on July 23. He said the defendant initially denied that he had ever met the victim and that the victim had ever been to his house. He said the defendant told him that Ms. Laredo had visited the defendant "in the days prior" with a boyfriend and had gone to Carmel, Indiana afterwards until her return on July 22. He said after interviewing the defendant for a short time, he interviewed Ms. Laredo and Ms. LaBoy. He said he then confronted the defendant with Ms. LaBoy's statement that the defendant had admitted to her that he killed the victim and Ms. Laredo's statement that she witnessed her father shoot and kill the victim. He said the defendant then stated that Ms. Laredo shot the victim.

Kenneth Robbins testified that he was retired from his former employment as a jailer but that he still worked part time when needed. He said he fingerprinted the defendant in August 2002 and identified the fingerprint card. He said the defendant initiated a conversation with him on July 30, 2003, in which the defendant said the victim had been assaulting Ms. Laredo and that when the defendant attempted to separate the two, the defendant saw the victim had a knife, spun the victim around, and shot him.

Robert Carson testified that he was the chief detective for the Scott County Sheriff's Department and that he investigated the victim's death. He said he received a telephone call on a Friday afternoon from Gary Burchfield regarding a body Mr. Burchfield and his friends discovered while fishing. He said he and Detective Wade Chambers went to the scene at the New River. He said they located the body, which was submerged in twelve to eighteen inches of water near the center of the river. He said that the body was weighted with rocks and cinder blocks and that it took four people about an hour and a half to remove the body from the water. He said the body was in "pretty bad shape" and had signs of fish feeding. He said it appeared to

2

have been in the water about a week. He said the body was taken to the ambulance service in Oneida. He said they cleaned the body and determined that a chain was locked around the neck of the body and that the chain was attached to a block or a rock and that other rocks and blocks were tied to the body, as well. He said the body was later transported to UT Medical Center for an autopsy. He said the body was identified through fingerprinting as that of the victim.

Detective Carson testified that he was involved with interviewing the defendant and Ms. Laredo on July 23. He said the authorities obtained a search warrant for the defendant's home after the interviews. He said that the officers encountered Donna LaBoy at the home and that she gave her consent for the search, as well. He said that during the search, the officers were looking for any evidence of the crime, including rope, blue paint, a boat, a gun, bullets, and casings. He said a gun was not found but other items were, including rope, string, a barrel with blue paint, and a boat with blue paint. He explained that blue paint was of interest because there had been blue paint on some rocks at the crime scene.

Detective Carson testified that he returned to the defendant's home on July 26 after Ms. LaBoy provided some additional information to the authorities. He said that Ms. LaBoy gave consent for a search of the residence and that he found the "murder weapon," a shoulder holster, and ammunition buried in a can behind the well house that was behind the home. He said the can was a "military ammo can" and was inside two white garbage bags. He identified the weapon as a nine millimeter Beretta semiautomatic handgun. He said the defendant was in jail when this search was conducted.

Detective Carson testified that Ms. LaBoy brought a key to the authorities on July 30. He said the key fit the lock that had been on the chain around the victim's neck.

Detective Carson testified that he was involved in the interview process with respect to Ms. Laredo and that she told conflicting stories. He said that the conflicts in her statements

3

did not pertain to the identity of the person who shot the victim but that she admitted in her later statement that she knew before going to the river what was going to happen. He said she was arrested within a day or two of her second interview.

Detective Carson identified two letters he received in the investigation. He said he obtained them from the defendant's sisters, Linda Overton and Roshona Crabtree. He read the letter he received from Ms. Crabtree, in which the defendant asked Ms. Crabtree to get $8,000 from their mother in order to pay a hit man to kill Vanessa Laredo and Donna LaBoy. The letter stated that Ms. LaBoy was going to be killed first because she was providing information to the district attorney. It also provided information about where and to whom the money should be sent. Detective Carson also read the letter the defendant wrote to Ms. Overton, which stated that she should send $8,000 and provided a name and address. The letter stated that the person to whom the money was sent would pay the hit man. The defendant stated in the letter that he thought Donna was "going to help work me over in court up there" and then was going to move on with her life. The defendant stated in the letter that Vanessa, not he, shot the victim after he had struggled with the victim.

David Hoover, a forensic scientist with the Tennessee Bureau of Investigation, testified as an expert in latent fingerprint examination. He said he identified a latent fingerprint on the side of the "ammo box" as matching the defendant's left thumb. He said he was unable to find identifiable fingerprints on any of the items inside the box or the white plastic garbage bags. He said he also examined two letters submitted and found the defendant's latent fingerprints on them.

Kelvin Woodby, a forensic scientist with the Tennessee Bureau of Investigation, testified as an expert in serology and DNA comparison analysis. He said he recovered human blood from three places on a boat that was stored at the Scott County Jail. He was unable to obtain a DNA profile from any of the samples.

4

Detective Randy Lewallen testified that he was a deputy with the Scott County Sheriff's Department. He said he helped recover the victim's body from the New River. He said this was a difficult task due to the rocks that were tied to the body. He identified the rocks, blocks, ropes, chain, lock, and bullet that were recovered from the victim's body. He said that Donna LaBoy admitted that she had tied a web of knots around one of the rocks.

Steve Scott of the Tennessee Bureau of Investigation testified as an expert in firearms examination, ballistics, and firearms ammunition comparison. He said he examined a gun and bullet in connection with the investigation of the victim's death. He identified the weapon as a Beretta semiautomatic nine millimeter pistol. He said the bullet had been fired from the gun. The bullet had been taken from the victim's head during the autopsy, and the gun had been identified as being the one exhumed during the second search of the defendant's property.

Doctor Darinka Mileusnic-Polchan testified as an expert in forensic pathology. She said she performed the autopsy of the victim on July 19, 2003. She said the body had strings and chain around the wrists, neck, and ankles. She said the body was in poor condition due to having been submerged in water and from decomposition. She said that the primary injury was a gunshot wound to the head and that a bullet was recovered from the victim's head. She said the bullet entered the back left of the victim's head. She said the gun was in close proximity to the victim's head when the bullet was fired, although she could not determine whether it was "loose contact" or "tight contact."

Donna LaBoy testified that she met the defendant in August 2002 and moved into his home later that year. She said she lived there until the defendant's arrest in July 2003. She said she met the defendant's daughter Vanessa on July 5, 2003, with Vanessa's Hispanic boyfriend named Joe. She said Vanessa claimed to be separated from the victim. She said that Vanessa and Joe stayed overnight and that she next saw Vanessa on July 8 when she came to the home with the victim. She said that on July 7, she had heard the defendant talking on the phone

5

with Vanessa and overheard the defendant say "to get him down here and that they would take care of him and she wouldn't have to worry about him anymore." She said she heard the defendant tell Vanessa that she should tell the victim that they could come to live in Tennessee and that the defendant would hire the victim to work in his garage. She said the defendant hung up the phone and said to her, "I've got to do something really bad," and then told her that he was going to kill the victim. He said Vanessa and the victim arrived at the house about ten minutes later. She said that after a while, Vanessa and the defendant went outside alone. She said the defendant, Vanessa, and the victim were preparing to go camping and fishing when a family arrived unexpectedly to visit. She said the family stayed for a couple of hours and that during their visit, she went inside the house and saw the victim with his hands around Vanessa's neck. She said she later observed the two of them coming out of the bathroom and saw that Vanessa had a handprint on her face. She said Vanessa told her a few minutes later that the victim was mad because she had started her period and was not pregnant.

Ms. LaBoy testified that she, the defendant, Vanessa, and the victim left in her truck after the visitors left. She said that they took a boat and supplies and that the defendant had a rifle and a nine millimeter Beretta with him. She said the defendant wore the Beretta in a shoulder holster underneath a tee shirt and a jacket to conceal it from the victim. She identified the Beretta in evidence as the one the defendant took with him. She said the defendant told her to pack extra clothes for him because he would need them after he killed the victim.

Ms. LaBoy testified that when they got to the river, they launched the boat. She said that she left and went home and that the plan was for her to meet them at the same location at nine o'clock the next morning. She said she was scared and called a friend in Kentucky that night. She said that she picked up Vanessa and the defendant the next morning and that the defendant told her they had killed the victim. She said that after they returned home, the defendant told her that he shot the victim in the head and that they had tied rocks to his body and belt loop and thrown him into the New River. She said that as

6

they were eating breakfast, the defendant and Vanessa both claimed to have killed the victim. She said the defendant and Vanessa burned the victim's clothing, some of the camping gear, life jackets, and the seats from the boat. She said the defendant put the ashes in a bag and disposed of them in a dumpster.

Ms. LaBoy testified that Vanessa drove the victim's car to Illinois. She said she and the defendant went with Vanessa in Ms. LaBoy's truck. She said that Vanessa left the car in a corn field, that the defendant and Vanessa "wiped it down," and that the defendant poured gasoline on it. She said the defendant, who had a gun, forced her to ignite the car.

Ms. LaBoy testified that the three of them went to Vanessa's apartment in Carmel, Indiana, where they spent the night, retrieved Vanessa's possessions, and picked up her paycheck. She said they drove to Kentucky and disposed of the license plate from the victim's car in a river. She said they then returned home to Scott County.

Ms. LaBoy testified that the three of them went to the river with the boat. She said Vanessa and the defendant attempted to move the body in the river. She said the defendant told her that Vanessa was unable to "handle it" and insisted that she must help him. She said that she went with the defendant in the boat and that the defendant tied concrete blocks to the body and threw the blocks overboard, almost sinking the boat because he had tied the body to the boat. She said the defendant took rope, chain, and a padlock from the house to the river. She said that the defendant had purchased some of the rope before the murder and that she had purchased other rope at the defendant's request after the murder.

Ms. LaBoy testified that she and the defendant made another trip to the river. She said that the defendant wanted to weight the body if it was floating and that it was. She said the defendant had her tie ropes into a web around a rock.

Ms. LaBoy testified that the defendant and Vanessa discussed saying that Vanessa's boyfriend Joe killed the victim

in Indiana and brought the body to Tennessee and disposed of it in the river. She said Vanessa also discussed saying that the victim was involved with drugs and had been killed by a drug dealer.

Ms. LaBoy testified that she and the defendant were in Clinton taking Vanessa to her mother's apartment when the defendant was arrested. She said she was allowed to drive her truck to the Campbell County Jail, where she was interviewed but not arrested.

Ms. LaBoy said that she visited the defendant in jail and that he drew a map and told her and the defendant's sister where the gun was buried. She said he asked them to take the gun out of state and destroy it. She said that the map indicated the gun was behind the well house and that she had not known this. She said the defendant ate the map. She said that they agreed to dispose of the gun but that she called the 9-1-1 center and requested that the authorities meet her at her house because she knew where the gun was located. She said the authorities arrived and found the gun in the location the defendant had identified. She said she found some keys and some of the victim's belongings and provided those to the authorities.

Ms. LaBoy testified that she continued to visit the defendant while he was in jail and that they wrote letters to each other. She said she acted like she was "madly in love" with the defendant but that he had "messed up [her] whole life."

Ms. LaBoy testified that she and the defendant learned that the victim's body had been discovered by fishermen when they heard it on a police scanner. She said they had planned to buy Quikrete later that day and take it to the river to weight down the body.

Ms. LaBoy read portions of letters she received from the defendant. In one, he asked her to say that she was at the river when the victim was killed. He proposed that she either say that Vanessa shot the victim or that the defendant did so when the victim attacked Vanessa and him with a knife. In another, he

8

asked Ms. LaBoy to help him in court. He said he did not kill the victim. He proposed that they say that Ms. LaBoy was present for the murder but that she had a panic attack and that none of them planned for it to happen. In a third letter, the defendant told Ms. LaBoy that she should say that the victim attacked Vanessa at the river, leaving a tooth mark on her, and that Vanessa killed the victim. In another excerpt, the defendant expressed his consternation with Ms. LaBoy for telling the authorities about the gun. He stated that Vanessa had her own gun at the river that night. In another letter, the defendant asked whether Ms. LaBoy was willing to lie on the stand for him and requested that she write back using a numerical code to answer the question.

On cross-examination, Ms. LaBoy maintained that she saw the defendant with the nine millimeter Beretta before he left with the victim and Vanessa, despite her inconsistent testimony at the preliminary hearing. She said that the defendant had been so insistent that she had been at the river that he "pretty much had [her] to the point that he was making [her] believe anything he said." She maintained, however, that she had not been at the river. She said she wanted to believe that the defendant would not kill anyone. She admitted that she took medication for anxiety and panic attacks but claimed she did not have memory problems unless she was having a panic attack. She admitted that she had taken medicine for her anxiety on the day Vanessa and the victim came to her house and that she drank one or two beers. She said she was "overmedicated" with six to twelve Hydroxypam pills on the day of the preliminary hearing because she was claustrophobic and had been "closed up back there in a room." She said the prescribed dosage was three pills a day.

Ms. LaBoy testified that she had been charged in connection with the victim's murder. She said, however, that the state had not promised her anything in exchange for her testimony. She said she did not call the police after dropping off the defendant, the victim, and Vanessa at the river because the defendant told her that if the police came to the river he would come to the house and kill her. She denied that she was the person who buried the gun. She admitted that she wrote letters

to the defendant in jail expressing her love for him and blamed it on "[s]tupidity." She admitted she had testified at the preliminary hearing that Vanessa had an opportunity to go inside the house and retrieved the defendant's gun before going to the river, but she said she knew the defendant had the gun on his person when they left.

Ms. LaBoy testified that the defendant had placed his nine millimeter gun and his ammunition in an "ammo box" and had her get two garbage bags in which to place the box. She said that night she was awakened by the defendant, who told her not to go outside or look out the windows. She said she stayed in bed. She said that later the defendant confronted her and questioned whether she had watched him.

Ben Johnson testified that he was driving in Jefferson County, Illinois on July 10, 2003, when he was nearly hit by a white Chevrolet truck that drove out of a field without stopping. He said there were three people inside the truck. He noticed a fire down the lane but proceeded on to his father's house for dinner. He said he told his father about the fire and that his father went to the fire on his four-wheeler.

Bill Johnson testified that his son and his son's girlfriend came to his house for dinner on July 10, 2003. He said that after speaking with his son, he rode his four-wheeler up the road and saw a burning car, which he described as having two doors and being bluish gray. Jefferson County, Illinois Sheriff's Deputy Scott Smith testified that he responded to the scene of a car fire on July 10, 2003. He said the car was on a dead-end road and that it was so badly burned that he was unable to find a vehicle identification number. Fred Brown testified that he was an investigator with the Illinois Secretary of State Police and that he assisted in the investigation of the burned car. He said that he located the vehicle identification number and that it matched a 2003 two-door Chevrolet Cavalier registered to the victim.

The defendant's sister, Linda Overton, testified on his behalf. She said she received two letters from the defendant but did not open them. She said she had received and opened other

letters from the defendant but that she had not picked up her mail to retrieve the two letters until after she was questioned by the authorities. She said the officers who questioned her humiliated her in her workplace. She said she told the officers she would retrieve and turn over the letters. She identified the handwriting in a third letter as looking like the defendant's.

The defense recalled Detective Lewallen, who testified that he transported the defendant to Riverbend Prison on October 2, 2003. He said that he attempted to prevent the defendant from talking to him but that the defendant was insistent upon doing so. He said the defendant told him that his daughter Vanessa was the person who shot the victim. He said the defendant stated that his gun was damaged when Vanessa was startled and dropped the gun on rocks. He said the defendant requested that he ask Detective Carson to check the gun for the damage. He said the defendant stated that the gun was an expensive, limited edition weapon and that if he were going to shoot someone, he would not use it. He said the defendant stated that he did not know the gun was at the scene until his daughter pulled it out. He said the defendant told him that he had recently become acquainted with his daughter after many years of not having contact with his children.

Vanessa Laredo testified that she was married to the victim. She said the victim had been physically abusive to her when he was drinking. She said that they had been separated at times due to his abusiveness and that he had been arrested once for the abuse. She said her parents divorced when she was twelve or thirteen and that visitation with the defendant ceased after an incident between her parents in which the defendant ran her mother off the road. She said she next saw her father when she was about nineteen years old. She said she talked to the defendant by telephone after her brother told her the defendant had changed and that she saw the defendant on July 5, 2003, when she was with Joel Comingo. She said she was separated from the victim at the time. She said after she returned to her home in Indiana, the victim broke into her apartment and assaulted and raped her on July 6 or 7. She said that she called the defendant and that he said he would "take care of it" if she

11

would bring the victim to Tennessee. She said the defendant did not explain what he meant. However, she admitted that she came to understand that he meant he was going to kill the victim and that she did nothing to stop him.

Ms. Laredo testified that she thought she arrived in Scott County with the victim on July 7. She said that she and the defendant did target shooting that day. She said she shot the defendant's shotguns but not a pistol. She said that while they were at the defendant's house, the victim choked her for wearing a pair of shorts of which he disapproved and slapped her for refusing to have sexual relations with him.

Ms. Laredo testified that she went to the river with the defendant and the victim. She said Ms. LaBoy drove them to the river and left in her truck. She said that as they were putting the boat in the water, the defendant told her that her problems would be over in a few hours. She said they went down the river in the boat. She said that they set out fishing poles and that the defendant and the victim drank beer and ate watermelon. She said they stayed in the same location for an hour or two and then went down the river. She said they went to shore but did not set out fishing poles this time. She said that at about 7:30 a.m., she and the victim were skipping rocks when the defendant shot the victim. She said she turned and saw the defendant putting a pistol into a holster under his shirt. She said she had known there was a shotgun on the trip, but she had not known about a pistol. She denied that she had ever told anyone that she was the person who shot the victim. She said there was no altercation during the trip to the river in which the victim was abusive to her. She denied that either she or the defendant had struggled with the victim. She said the victim did not have a knife. She said that she had bite marks on her chest but that they were from the sexual assault that had taken place in Indiana.

Ms. Laredo testified that after the defendant shot the victim, the defendant told her to get into the boat. She said the defendant washed blood off the bank and put the victim's body and some rocks into the boat. She said the defendant covered the victim's body with a blanket and said, "Look at him. That's

12

the kind of man that would have killed you one day." She said the defendant tied rocks to the victim's body and pushed him into the river. She said they paddled down the river to a bridge, where they took the boat out of the water and waited for Ms. LaBoy to pick them up. She said Ms. LaBoy did not ask about the victim's whereabouts.

Ms. Laredo testified that they did not talk about what happened when they returned to the defendant's house. She said that the defendant told her they needed to dispose of the victim's possessions and that they burned them in the back yard. She said that she thought she called Mr. Comingo several times that day and told him she wanted to come back to Indiana but that she did not tell him what had happened.

Ms. Laredo testified she gave a statement on July 23 and gave a second statement a few days later. She said her first statement was not truthful. She said that she was charged with the defendant and that she was pleading guilty. She denied that she shot the victim.

Ms. Laredo testified that she went with the defendant and Ms. LaBoy to Illinois to burn the victim's car and that they also went to Indiana. She said that on this trip, the defendant threw the license plate from the victim's car into a river in Kentucky.

The defendant testified that he was honorably discharged from the Army and had worked various jobs until becoming a truck driver. He said that he met Donna LaBoy in August 2002 and that she moved into his home in March 2003. He said he had seven children, one of whom was deceased. He said he had divorced Vanessa Laredo's mother when Vanessa was twelve or thirteen years old and that other than going to visit Vanessa at her workplace one time, he had no relationship with her until Father's Day, 2003. He said Vanessa called him on Father's Day and they discussed going fishing. He said he and Vanessa talked again and made arrangements to see each other when Vanessa planned to be in Tennessee for July Fourth.

13

The defendant testified that Vanessa and her boyfriend Joel visited overnight on July 5. He said that Vanessa and Joel slept in the bedroom he normally shared with Ms. LaBoy and that his nine millimeter Beretta was kept in the nightstand in that room. He said he was unaware at this time that Vanessa was married to the victim.

The defendant testified that Vanessa called him on July 8 and said she had been fired from her job because she had returned late from her trip to Tennessee. He said she inquired whether she could stay with him for a while and look for a job in Tennessee. He said that he agreed and that she arrived that evening about 8:30 p.m. with a man she introduced as her husband, Armando Laredo. She said that Vanessa pulled Ms. LaBoy aside and talked to her and that Ms. LaBoy later told him that Vanessa said not to mention to the victim the other man with whom she had visited previously. She said the four of them sat around drinking beer and talking. He said that he and Vanessa walked around his garage talking and that Vanessa asked if he would teach the victim how to do automotive body repair work in his garage. He said he later went to the garage with the victim and talked to him about learning to do automotive work.

The defendant testified that a family came to visit that evening but eventually left because Vanessa kept insisting that she wanted to go fishing. He said they gathered the fishing equipment and went to a grocery store. He said Ms. LaBoy dropped them at the river and went back to the house. He said he had a rifle to kill snakes and other equipment for fishing and camping. He said they paddled down the river and went to shore to fish. He said they talked, drank beer, and ate watermelon. He said that the fish were not biting and that they decided to go downstream. He said the fishing was no better in the second location. He said that the victim and Vanessa talked in "Mexican" and that it sounded like they were arguing and discussing "Joe." He said that the victim had consumed eight to twelve beers and that he had consumed six or seven. He said that he went into the bushes to relieve himself and that Vanessa screamed for him to help her. He said he ran back and found

14

Vanessa on the ground and the victim on top of her hitting her. He said the victim was biting Vanessa's chest. He said he was unable to pull the victim from Vanessa and hit the victim two or three times. He said he and the victim rolled around in the mud and rocks and hit each other. He said the victim got to his feet and started kicking and stomping him. He said the victim pulled a knife and said, "I'm gonna kill you and your d--- b---- of a daughter also." He said that he grabbed the hand in which the victim had the knife and that the victim started hitting him with a rock. He said that he hit the victim and that they were both bleeding. He said their struggle lasted no more than two minutes and was halted when a shot rang out and the victim fell away from him. He said he saw Vanessa with the gun in her left hand and saw the gun drop to the rocks. He said after two or three minutes, he checked the victim's pulse and found none. He said he suggested that they call the authorities, but Vanessa insisted that they not because she had an order of protection against the victim and thought the authorities would not believe them. He said that it was Vanessa's idea to put the victim in the water, and that although he disagreed, he acquiesced. He said that the two of them loaded the victim's body into the boat and that Vanessa tied rope from a tackle box to rocks. He said that he tied the ropes to the victim's body and that they pushed the body into the water. He said the victim was shot about 5:15 or 5:30 a.m.

He said Ms. LaBoy was not at the place where she was supposed to pick them up at 9:00 a.m. but eventually arrived. He said that she inquired where the victim was and that he told her something bad had happened, which he could not discuss at that time. He said they went home and unloaded the boat. He said he had to put air in the tires of the victim's car because Ms. LaBoy had let the air out of them. He denied that he admitted shooting the victim to Ms. LaBoy. He said Vanessa called her boyfriend Joel repeatedly, which he said was reflected on the telephone bill. He said he did not know what Vanessa said to Joel because she spoke in "Mexican." He said he went to bed and woke up to find Ms. LaBoy and Vanessa smoking marijuana. He said there was no discussion of disposing of evidence until later that evening. He denied burning any of the

15

items but said that the women did so and that he hauled the ashes to the landfill.

The defendant testified that on July 10, the women suggested driving the victim's car to Chicago and abandoning it on a back street. He said that he agreed but that once they set out and stopped for gas along the way, Vanessa suggested that they do something with it there. He said he agreed because the truck was using a lot of gas. He said they took the car to a corn field. He said he poured gas on it and Ms. LaBoy started a fire. He said burning the car was Ms. LaBoy's idea. He said the three of them went to Vanessa's apartment in Carmel, Indiana. He said that Vanessa visited Joel, that they spent the night at Vanessa's apartment, and that they gathered Vanessa's belongings. He said that they traveled home and that on the way, he threw the license plate from the victim's car off a bridge.

The defendant testified that a couple of days after returning to Tennessee, the three of them went to the river to check on the victim's body. He said Vanessa wanted him to cut off the victim's hands and head so that he could not be identified but he refused. He said he and Ms. LaBoy tied cinder blocks and rocks to the victim's body. He said he and Ms. LaBoy went to the river another time without Vanessa and Ms. LaBoy put the chain around the victim's neck. He said the lock on the chain was Ms. LaBoy's.

The defendant testified that before his arrest, Ms. LaBoy had buried the gun. He said he was home at the time but did not participate and did not know the location. He said that after he was arrested, he had a conversation with Ms. LaBoy at the jail in which she told him the authorities had searched the yard with metal detectors and dug holes but had not found the gun. He said Ms. LaBoy whispered to him about the gun's whereabouts but he could not hear her. He said that she drew a map and that he still could not understand and that he drew a map to help him understand. He said he ate the map at Ms. LaBoy's direction.

16

The defendant testified that he had written letters to various women while in jail. He admitted writing the letters that had been received as evidence. He acknowledged that some of the letters instructed Ms. LaBoy to testify falsely and that some of them discussed hiring a hit man. He said he was mad at Ms. LaBoy for cooperating with the state. He said he wrote the letters out of anger but "meant nothing by them." He admitted writing a letter in which he claimed Vanessa had her own gun at the river and acknowledged that this was not true. The defendant admitted his prior convictions for domestic assault and carrying a weapon in his truck.

The defendant testified that he was wearing a t-shirt that "fit pretty good" the night he went to the river with Vanessa and the victim. He denied that he was wearing a shoulder holster or a jacket. He said he did not check the night stand for his pistol before he left and did not know that Vanessa had it with her.

On cross-examination, the defendant admitted that Ms. LaBoy had not been present when the victim was killed. He stated he was unaware of any plan to kill the victim before going to the river. He said that Vanessa told him she had taken the pistol to the river just to shoot it and that he did not believe she planned to kill the victim. He denied that he told Ms. LaBoy he was going to kill the victim at the river. He admitted that he had been untruthful with Agent Vinsant when he was interviewed on July 23 by denying that he knew the victim. He said his words did not come out correctly when Agent Vinsant understood him to say Vanessa shot the victim while the victim was squatting down using the bathroom. He said what he meant to say was that the way in which Vanessa shot the victim was "s-----" but that he did not get the chance to correct himself because Agent Vinsant walked away. The defendant admitted telling Kenneth Robbins that he had pulled the victim off Vanessa, slung him around, and "popped" him.

The defendant testified that he told Vanessa in the beginning that he would take the blame for the victim's death because she was only twenty-two years old and had her whole life ahead of her. He said that he did not recall telling inmates

17

Billy Gunter and Brandon Green he shot the victim. He admitted saying to inmate Mitchell Green that he had revealed the location of the weapon to someone and was concerned that person would turn it over to authorities.

Walter Jackson testified on rebuttal that he, his wife, and his toddler son went to the defendant's house in early July 2003. He said he wanted to see about buying some automotive parts from the defendant. He estimated it was after 9:00 p.m. He said the defendant, his girlfriend, his daughter, and his daughter's husband were at the defendant's home. He said they stayed "[a]bout 30 minutes, maybe a little longer." He said they left after the defendant's daughter came out and said they had to go to the store. He said the defendant did not ask him to go fishing with them. He acknowledged having previously told counsel he did not remember what had been discussed.

After receiving the evidence, the jury found the defendant guilty of first degree murder. The trial court imposed a life sentence.

State v. Charles Ray Harvey, No. E2006-00882-CCA-R3-CD, Scott County, slip op. at 1-12 (Tenn. Crim. App. Mar. 4, 2008).

Through counsel, the Petitioner filed his petition for post-conviction relief on March 3, 2009. The petition alleged that trial counsel were ineffective in failing to advise the Petitioner that he should accept the State's plea offer and that he had no realistic chance of prevailing at trial. The petition also alleged that counsel were ineffective in waiving an opening statement, not raising an objection to admission of the "'killer for hire' letters," failing to voir dire the State's DNA expert about his qualifications, and failing to meet with him for sufficient time to prepare him adequately to testify at trial.

At the post-conviction hearing, the Petitioner testified that he was represented briefly by appointed attorneys but that he retained the services of his trial attorneys. He said he met with his trial counsel "a little bit" to prepare for trial. He stated that his attorneys communicated the State's plea offer to him but said only that they were obligated to convey it to him. He said there were three alternatives in the plea agreement: a twenty-year sentence, a sentence between fifteen and twenty-five years to be determined by the trial court, and a fifteen-year sentence consecutive to a ten-year sentence. He said he had a good reason

18

to reject the plea agreement because his attorneys advised him that they would "give [him] a fifty-fifty chance" at trial.

The Petitioner acknowledged that the State's evidence included his fingerprint on the box containing the murder weapon, that there was blood evidence, and that he assumed his co-defendant, who was his daughter, was going to testify against him. He said he knew that the State had letters he wrote about hiring a hit man to kill witnesses and requesting that his girlfriend lie in her trial testimony. When asked if he and his attorneys discussed why he should take the case to trial and how they could win, he said, "Not too much." He said, "I just went on what the attorneys said, you know, we had a pretty good chance of winning the case on what evidence we had." He admitted, however, that he had no favorable evidence.

The Petitioner said his attorneys never discussed the State's plea offer with him except when they told him they were obligated to show him the offer. He said this conversation lasted no more than two to three minutes.

The Petitioner acknowledged that his attorneys visited him in prison before the trial. He said that he only recalled two occasions when they visited and that two of the three came each time. He recalled his initial appointed attorney giving him discovery materials at a court appearance and later visiting him in prison, but he did not recall discussing the plea offer with this lawyer. He acknowledged that he also wrote letters to his trial attorneys and that he talked to them by telephone. He said he received a few letters from his trial attorneys.

The Petitioner identified a letter from lead counsel, John Mitchell. The three-page letter was dated November 19, 2004, and stated that it was written to address numerous letters and questions from the Petitioner. The letter detailed the strengths and weaknesses of the State's case against the Petitioner:

> The strengths of your case are the fact that you had no reason to kill Armando and Vanessa did. However, the weaknesses in your case are the many, many statements that you have made, both orally and in writing, concerning the different ways the murder occurred, who did it, why it was done, etc. The worst parts of your case are the two "hit men" letters which you sent to Linda. I would have thought you knew that all letters going in or out of the Tennessee penal system are opened, read and photocopied, if necessary.
>
> . . .

19

You have assisted the State with all of your various letters so they have a fairly strong case as far as the murder is concerned, but they do not have an extremely strong case as to who actually "pulled the trigger." They are depending on Vanessa to testify on that and how she holds up under cross-examination, etc., will be critical. The weaknesses of the prosecution's case are that they do not have anyone who knows who "pulled the trigger" except you and Vanessa. First degree murder is not as likely as second degree murder but, yes, a conviction for first degree murder could be obtained by the State if the jury believes there was sufficient premeditation by virtue of the fact a gun was taken on a fishing trip. Actually, we do not have to prove that Vanessa killed her husband; we simply need to show there was insufficient proof to show that you did it.

. . .

. . . [R]est assured that we are going to give you the best defense we can in spite of the fact that the State has 80 plus letters from you in various stages of denial, admission, story changes, etc.

The letter also referred to counsel's reasons for not representing the Petitioner in an Anderson County case, an earlier discussion about a change of venue, counsel's upcoming conversation about the case with the District Attorney, the Petitioner's bond, out-of-state witnesses suggested by the Petitioner, the unlikelihood of a successful motion to suppress, and counsel's advice that the Petitioner refrain from writing additional letters to anyone other than counsel.

The Petitioner identified a plea offer that he signed noting his rejection on December 9, 2004. The offer states three alternatives: (1) a guilty plea to second degree murder with a twenty-year sentence, (2) a guilty plea to second degree murder with the trial court to determine a sentence between fifteen and twenty-five years after conducting a sentencing hearing, or (3) a guilty plea to voluntary manslaughter and theft over $1,000 with consecutive sentences of fifteen and ten years to be served at forty-five percent release eligibility. It stated above the Petitioner's signature that the defendant had read the offer, that he understood its contents, and that his attorney had explained any questions he had. The Petitioner stated that his attorneys did not provide advice about whether the offer was a good one and whether he should accept it. He restated that they only told him they were obligated to inform him of it.

20

The Petitioner acknowledged that while he was in prison before trial, he began corresponding with Angela Brown, whom he met when they were inmates at the county jail. He acknowledged a letter he wrote to Ms. Brown in which he reported his rejection of the plea offer, his refusal to take any plea, and his desire to go to trial. When asked about his statement in the letter that he had "many real good reasons" to go to trial, he explained that his attorneys told him he had a fifty-fifty chance of "winning." He said he did not remember the factual basis recited by his attorneys for his likelihood of a favorable outcome. He denied telling his attorneys that he could not plead guilty because he did not kill the victim.

The Petitioner denied believing that he would not be convicted by a Scott County jury for killing an illegal alien from Mexico. He said his attorneys told him they would "get the letters [he wrote about hiring someone to kill witnesses] dismissed under Rule 16." He denied that he insisted on testifying and stated that his attorneys told him he was one of their key witnesses who wanted to testify. He said that his attorneys did not talk to him much about his testimony and that he did not have the opportunity to review all of the discovery materials in detail.

The Petitioner acknowledged a letter he wrote to Ms. Brown in which he stated that he had three attorneys who were "the best money can buy," that the attorneys had never lost a case, that he trusted them one hundred percent, and that he expected to be out of jail by July. He said that when he wrote the letter, he believed his attorneys had never lost a case. He said he did not know at the time that his daughter would testify for the State.

Darwin Colston testified for the State that at the time of the Petitioner's trial, he was an associate at the law firm that represented the Petitioner and was now a partner. He said that at the time, the firm's caseload was approximately ninety percent criminal cases. He said he met the Petitioner at Riverbend prison at least three times and that he had extensive meetings with the Petitioner when there were hearings in Scott County. He said that trial counsel was with him two of the three times when he went to the prison, that co-counsel was there every time, and that Valerie Maleug was there once.

Mr. Colston testified that the Petitioner received a large amount of discovery before his firm was retained. He said that additional discovery, such as Tennessee Bureau of Investigation (TBI) lab reports, were received after the firm began representation.

Mr. Colston testified that the November 19 letter trial counsel wrote to the Petitioner fairly summarized the strengths and weaknesses of the case. He said trial counsel, co-counsel, and possibly Ms. Maleug were present when the written settlement offer was conveyed to the Petitioner. He said they advised the Petitioner that they were required to convey the offer and that it was the Petitioner's decision whether to accept it or go to trial.

21

He said that they discussed the offer and that he was concerned whether the Petitioner understood that the jury could believe his testimony completely yet still convict him of first degree murder. He said he talked to the Petitioner extensively to try to make him understand that he could be found criminally responsible for first degree murder even if the jury believed the Petitioner's version of events, which was that he did not know his co-defendant was going to kill the victim but that he helped her conceal the crime afterwards.

Mr. Colston did not recall whether his firm recommended that the Petitioner accept one of the alternatives in the plea offer. He testified that he advised the Petitioner about the time he would be required to serve with the various alternatives in the plea offer. He said he explained the process of sentencing for the alternative that afforded a sentencing hearing. He believed they discussed sentencing reduction credits but said he could not specifically recall the discussion. He said the discussion about the plea offer took "maybe half an hour." He said that the discussion was relatively short but that the Petitioner was given the chance to ask questions. He said the Petitioner maintained that he could not plead guilty.

Mr. Colston acknowledged that Mr. Mitchell may have told the Petitioner he had a fifty-fifty chance once or twice. He said this advice was based upon the caveat of the "hit man" letters being excluded. He said that contrary to the Petitioner's allegation, counsel filed a motion to suppress these letters. He said that they thought the motion would be denied and that they were surprised when the trial court initially ruled in their favor. He said, however, that the trial court reversed its ruling the following morning. He recalled that someone mentioned to the Petitioner that they could approach the State at this point and request another plea offer but that the Petitioner maintained he could not plead guilty if he did not shoot the victim. Mr. Colston said there were no further plea negotiations.

Mr. Colston testified that because he was concerned whether the Petitioner understood that he might be found guilty even though he did not shoot the victim, he discussed the matter with Mr. Mitchell. He said they decided to request a mental examination of the Petitioner. The Petitioner was later evaluated by Ridgeview Mental Health and found competent and not insane.

Mr. Colston testified that the day after the Petitioner rejected the plea offer on December 9, 2004, Mr. Mitchell wrote to the prosecutor, stating that the Petitioner wanted to discuss the matter with his family. He said that the deadline for accepting the plea was January 4, 2005, and that they hoped the Petitioner would reconsider during this time. He said the Petitioner never changed his mind. He said that he would have preferred that the State offered a voluntary manslaughter plea agreement but that the offer they extended was not unreasonable.

Mr. Colston testified that Mr. Mitchell made the decision to waive the opening statement and that he was not privy to the rationale behind that decision. He said that waiving the opening statement or closing argument was a tactic that Mr. Mitchell used successfully in other cases and that Mr. Mitchell's decision was based on the facts and circumstances of each case. He said that he could not speak for Mr. Mitchell, but that perhaps the prosecutor did not state things in the opening statement that the defense anticipated.

Mr. Colston testified that they did not try to dissuade the Petitioner from his desire to testify at the trial. He said that the co-defendant was going to testify that the Petitioner shot the victim and that in such a scenario, the jury would want to hear the Petitioner deny this. He acknowledged that the Petitioner had given different stories about what happened and that these had to be reconciled. He said that both the co-defendant and the Petitioner's girlfriend were credible State's witnesses and that he did not believe there was "any chance" without the Petitioner testifying. He said that the defense tried to anticipate the questions the Petitioner would receive and that they met with the Petitioner to prepare him for his testimony.

On cross-examination, Mr. Colston acknowledged that Mr. Mitchell's November 19 letter outlining the strengths and weaknesses of the case did not mention the Petitioner's girlfriend, Donna LaBoy, who later testified that the Petitioner admitted killing the victim. He agreed that Ms. LaBoy was never charged criminally and that she was a better witness for the State than the defense had anticipated. He admitted they did not impeach Ms. LaBoy about whether she received a deal in exchange for her testimony. When asked about the letter's failure to mention the Petitioner's various accounts of the crime or the forensic evidence that might challenge the Petitioner's stories, he noted that the letter was written in response to the Petitioner's letters and that these matters were discussed with the Petitioner later. He disagreed that the forensic proof showing that the victim was shot at close range in the back of the head would disprove the Petitioner's explanation to counsel that he had the victim on the ground hitting him when the co-defendant walked up and shot the victim. He knew there was information in the discovery materials of the Petitioner talking to a prison guard about self-defense.

Mr. Colston acknowledged that it was a fair statement that he was never sure the Petitioner understood criminal responsibility. He said they never tried to force the Petitioner to take the plea offer because the decision was the Petitioner's. He said they told the Petitioner that his chances were less than fifty-fifty if the "hit man" letters were admitted. He acknowledged no issue was raised in the motion to suppress about the State's basis for intercepting the Petitioner's prison mail. He later recalled that the State obtained the letters through the Petitioner's sister, not the Department of Correction.

Edward Holt testified that he formerly practiced with the firm that represented the Petitioner at trial. He said his criminal law practice had been about ninety-nine percent of his caseload. He said he met with the Petitioner four times at Riverbend prison, as well as other times in Scott County when there were hearings. He said that on each occasion, the Petitioner's position was that he did not shoot the victim and could not plead guilty. He said that their first meeting lasted about three hours, during which the Petitioner explained the circumstances of the offense to him in detail. He said each subsequent meeting "was like rehashing the same information."

Mr. Holt testified that counsel tried to impress upon the Petitioner the gravity of the letters the Petitioner wrote about obtaining a hit man and instructing his co-defendant how to testify. He said, "I felt like we tried the best we could to make him understand how important the letters and the various statements that he had made were [going to] be when his case came up, and . . . he just never wavered from his position." He said that whenever they mentioned a plea agreement, the Petitioner acted as if he did not want to hear it. He said this was the case when they mentioned the offer from the State. He said that one of the bases for the motion for a mental evaluation was that the Petitioner did not understand some of the things they tried to communicate to him.

Mr. Holt testified that although counsel advised the Petitioner that he did not have to testify, he did not think there had been an issue about whether the Petitioner would testify. He said they believed that in order to get the Petitioner's version of events into evidence and to explain that the Petitioner's letters were written in a panic, the Petitioner would have to testify.

On cross-examination, Mr. Holt testified that counsel tried to predict the questions the State would ask the Petitioner when they were preparing him for his testimony. He acknowledged that they never practiced his direct examination with him. He said he never conducted a "practice direct" because he did not want to put words into a witness's mouth. He said he prepared them to tell their story the best they could and to do their best with their answers.

Mr. Holt testified that the Petitioner "had stories all over the [prison] lot" about what happened when the victim was killed and whether he acted in self-defense. He said that there was a point at which it became obvious the Petitioner was not willing to listen to any reasoning about a plea bargain and that they felt they were wasting time to pursue this discussion further. He said, "I don't think we ever – I'm not sure that we recommended that he take a particular offer because at some point, it was obvious to us he was just not [going to] listen to it." He agreed it was not unusual for a client to lie to his attorneys about his involvement in a crime. He said he considered the circumstances "extremely bleak" once the

24

"hit man" letters were admitted. He said that before this point, he never considered the evidence against the Petitioner overwhelming because it pitted the Petitioner's word against his co-defendant's word. He said there was never any dispute that the victim was shot with the Petitioner's gun, which explained the Petitioner's fingerprint on the box containing the gun. He said that they thought they would be able to impeach Ms. LaBoy's testimony and that although they tried, the jury did not agree they did a good job. He said he "could not answer" why they never looked the Petitioner in the eye and told him he was going to lose and must make a plea deal with the prosecution.

On redirect examination, Mr. Holt testified that they realized the victim's status as an illegal alien from Mexico could be a favorable factor in a case tried in the rural South. He also said the fact the victim abused the co-defendant might be a factor in their favor. He said that taking into account these factors, counsel believed that the jury might convict the Petitioner of second degree murder and that the State's plea offer included sentences that were essentially equivalent to a second degree murder sentence. On recross-examination, he reiterated that "there was no convincing [the Petitioner] of anything," despite the fact that the plea offer was essentially equivalent to a second degree murder verdict, which the defense thought would have been a good outcome. He stated no one ever told the Petitioner he would not be convicted of any offense.

After receiving the evidence, the trial court found the Petitioner's trial attorneys' testimony more credible than the Petitioner's proof. The court found that it was very clear from an early point that the Petitioner refused to plead guilty. The court found that the Petitioner's statements in his letters to Ms. Brown about his attorneys having never lost a case were merely boasting and not credible. The court also found that the Petitioner failed to show that he would have taken any plea offer. The court likewise rejected that the Petitioner would have accepted the agreement if he had known all of the details about when he might be released. The court noted that defense counsel had to walk a line between advocating a guilty plea and maintaining credibility and civility with their client. The court found that the Petitioner failed to show that counsel's performance was deficient. The court did not address prejudice, stating that an analysis was unnecessary based upon its finding that there was no deficient performance. The trial court denied the petition.

On appeal, the Petitioner contends that he demonstrated by clear and convincing evidence that his attorneys were ineffective because they did not advise him he should accept the State's pretrial plea offer. The State contends that the trial court properly denied relief. We hold that the Petitioner has not shown that he is entitled to relief.

The burden in a post-conviction proceeding is on the Petitioner to prove his allegations of fact by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006);

Dellinger v. State, 279 S.W.3d 282, 294 (Tenn. 2009). On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456-57 (Tenn. 2001). Post-conviction relief may only be given if a conviction or sentence is void or voidable because of a violation of a constitutional right. T.C.A. § 40-30-103 (2006). Because they relate to mixed questions of law and fact, we review the trial court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Fields, 40 S.W.3d at 457.

Under the Sixth Amendment to the United States Constitution, when a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993). A petitioner will only prevail on a claim of ineffective assistance of counsel after satisfying both prongs of the Strickland test. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). The performance prong requires a petitioner raising a claim of ineffectiveness to show that counsel's representation fell below an objective standard of reasonableness or "outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690. The prejudice prong requires a petitioner to demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. In the context of a guilty plea, in order to prove prejudice, a petitioner "'must show that there is a reasonable probability that, but for counsel's error, he would not have pleaded guilty and would have insisted on going to trial.'" House v. State, 44 S.W.3d 508, 516 (Tenn. 2001) (quoting Hill v. Lockhart, 474 U.S. 52, 59 (1985)).

Our supreme court has held that attorneys should be held to the general standard of whether the services rendered were within the range of competence demanded of attorneys in criminal cases. Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). Further, the court stated that the range of competence was to be measured by the duties and criteria set forth in Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974), and United States v. DeCoster, 487 F.2d 1197, 1202-04 (D.C. Cir. 1973). See id. Also, in reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689. "Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982); see DeCoster, 487 F.2d at 1201.

26

The record reflects that the Petitioner refused to consider a guilty plea because he claimed he did not shoot the victim. Mr. Holt testified that he attempted to explain the Petitioner's likelihood of conviction to him but that the Petitioner never appeared to understand. He said that the Petitioner's lack of understanding was one of the reasons the defense team obtained a mental evaluation of the Petitioner, in which it was determined that the Petitioner was competent and not insane. He said that he informed the Petitioner of the plea offer and that it was pointless to continue the conversation because the Petitioner acted like he did not want to hear about a plea offer, as he had in past discussions of a plea bargain. Mr. Holt acknowledged that they never told the Petitioner he should accept the plea offer, and Mr. Colston could not recall whether they advised the Petitioner he should accept the plea. Both testified, however, that they spent time on several occasions discussing the Petitioner's case with him and trying to convince him that he faced the likelihood of a conviction if he went to trial.

The proof was undisputed that the Petitioner adamantly refused to consider a guilty plea and that he was adamant in his desire to go to trial. Although the Petitioner testified that he believed he could prevail based upon Mr. Mitchell's statement that he had a fifty-fifty chance to win the case, Mr. Colston testified that this advice was predicated upon the Petitioner's letters being excluded from evidence. Further, the Petitioner never testified that if counsel had advised him that he should accept the plea offer, he would have done so. In fact, the evidence is to the contrary and supports the trial court's conclusion in that regard.

This court notes the lack of proof that the Petitioner was ever advised that in counsel's professional opinion, he should accept the State's plea offer. As the trial court concluded, however, the Petitioner failed to show that he would have accepted the offer had counsel advised him it was the better course. In addition, the record reflects that counsel discussed the possibility of a plea bargain with the Petitioner before the offer was made and that the Petitioner had always insisted on going to trial. The record also reflects that trial counsel repeatedly advised the Petitioner about the many weaknesses of his case and the likelihood that he would be convicted of first degree murder, particularly if the trial court admitted his jailhouse letters. During their representation, trial counsel met with the Petitioner at length, and Mr. Mitchell wrote the letter introduced at the hearing in response to specific questions the Petitioner had about his defense. The Petitioner nevertheless persisted in unrealistic expectations of an acquittal, focusing on only part of counsel's advice about a fifty-fifty chance, rather than accepting the totality of counsel's advice about the realities of the case as a whole. When counsel became concerned that the Petitioner did not understand the gravity of the State's case against him, counsel secured a mental evaluation of the Petitioner.

We conclude that the evidence does not preponderate against the trial court's factual findings. We also conclude that based upon the particular facts of the case, the trial court did not err in holding that the Petitioner failed to show that counsel's performance was deficient. Although the trial court did not address the prejudice prong of <u>Strickland</u>, the evidence demonstrates that the Petitioner made no showing that had counsel given him additional advice, he would have accepted the plea offer. Thus, the Petitioner failed to establish that he was entitled to post-conviction relief.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
JOSEPH M. TIPTON,  PRESIDING JUDGE